# IN THE COURT OF APPEALS OF IOWA

No. 21-1762
Filed August 17, 2022

**CORY WILLIAM PLANTS,**
 Petitioner-Appellant,

**vs.**

**NATASCHA APRIL KELDERMAN,**
 Respondent-Appellee.
_____

 Appeal from the Iowa District Court for Polk County, Paul Scott, Judge.


 The father appeals from the district court order awarding the mother physical care of the parties' minor child. **AFFIRMED AS MODIFIED.**


 Andrew B. Howie of Shindler, Anderson, Goplerup & Weese, P.C., West Des Moines, and Maureen Catherine Cosgrove of McCormally & Cosgrove, P.L.L.C., for appellant.

 Mark R. Hinshaw of The Law Offices of Mark R. Hinshaw, West Des Moines, for appellee.


 Considered by Vaitheswaran, P.J., and Greer and Schumacher, JJ.

**GREER, Judge.**

Cory Plants appeals from the order establishing paternity, custody, visitation rights, and the child-support obligation, which gave physical care of the parties' minor child to the mother, Natascha Kelderman. Cory argues he can provide better care for the child, A.P., so he should be awarded physical care.[1] In the alternative, if we affirm physical care in Natascha, he asks that we increase his scheduled parenting time with A.P. Natascha asks that we affirm the district court's order and award her appellate attorney fees.

**I. Background Facts and Proceedings.**

Cory and Natascha are the never-married parents of A.P., who was born in late 2017. They ended their on-again, off-again romantic relationship in July 2018. When their relationship ended, Natascha returned to the home she owns in Des Moines; Cory continued to live in the home he owns in Harvey—about an hour's drive apart. Both parents are employed full-time outside of the home, and both have two other children from previous relationships. Cory has two daughters— born in 2009 and 2012—of whom he shares legal custody and physical care with his former wife. Natascha has two sons who have reached adulthood; she was their primary caregiver until about when they reached high school, at which point Natascha and her former husband decided the boys would move in with him during the week and spend weekends with Natascha.

---

[1] If we order A.P. to be placed in Cory's physical care, Cory asks that we remand to the district court to determine Natascha's scheduled parenting time and child-support obligation.

Cory filed the petition to establish custody, visitation, paternity, and child support almost immediately after Natascha moved out with A.P. and, within a few months of separating, the parents entered into a stipulated agreement on temporary matters. In October 2018, they agreed to joint legal custody of A.P. and what they titled a "shared care schedule"—although Cory had only eleven overnight visits with A.P. each twenty-eight days.[2] The agreed-upon schedule was for Cory to have parenting time as follows:

> Weekends:
>     I. Every weekend, beginning Friday at 5:30 p.m. when [Cory] picks the minor child up from [Natascha] or daycare, until Sunday at 7:30 p.m. when the parties meet in Prairie City to exchange the minor child.
> Alternating weeks:
>     II. [Cory] shall also have parenting time with the minor child during the week, on alternate weeks.
>     a. Beginning November 8th and every 4th week after, [Cory] shall have the minor child beginning on Thursday at 5:30 p.m. when he picks the minor child up from [Natascha] or daycare, and continuing until the Sunday exchange as provided . . . above.
>     b. Beginning November 22nd and every 4th week thereafter, [Cory] shall have the minor child beginning on Wednesday at 5:30 p.m. when he picks the minor child up from [Natascha] or daycare, and continuing until the Sunday exchange as provided . . . above.

Due to a number of continuances that were outside of the control of the parties, the two-day trial on Cory's petition did not take place until June 2021.

At trial, both Cory and Natascha recognized the distance between their two homes—combined with their poor ability to communicate with each other—made joint physical care unworkable. Cory testified he should be awarded physical care

---

[2] Cory was also given a 25% extraordinary visitation credit although the schedule placed A.P. in his care only 143 or 144 overnights a year. *See* Iowa Ct. R. 9.9 (giving parent with between 128–147 overnight visits a 15% credit to their share of support obligation, a 20% credit for 148–166 overnights, and a 25% to the parent with "167 or more [overnights] but less than equally shared physical care").

of A.P. because of the strength of the schools in his district and to allow her to spend the most time with her half-sisters. He voiced concerns about Natascha having physical care of A.P. because of Natascha's admitted use of marijuana to self-medicate her anxiety. Additionally, he questioned whether A.P. was safe with Natascha, noting that Natascha's stepfather sexually molested Natascha when she was a child; Natascha's mother—A.P.'s maternal grandmother—remains married to the stepfather, and Natascha relies on the maternal grandmother to provide care for A.P. at the maternal grandmother's home with the stepfather present. Yet, in requesting that he be given physical care, Cory asked to maintain the temporary schedule (with Natascha having seventeen of every twenty-eight overnights) until A.P. started preschool in the fall of 2022—more than a year after the trial was taking place.

Cory also brought up an incident that resulted in Natascha being charged with child endangerment and domestic abuse. According to Cory, he asked Natascha not to give his other children gifts anymore. Then, during an exchange of A.P. when Natascha had brought some gifts for Cory's other children, Cory

> had [A.P] and had got out of the car, and [he] asked Natascha again, [he] said, I don't want the presents. [He] said, keep them. And she c[a]me up to [him] and shoved [his] face back, kind of abruptly, and then proceeded to get into [his] car and threw the presents in the car. And then she took [A.P.] and put her in the car, and then walked around her car, after she had [A.P.] put in, with her middle finger up in the air, and said this is the hand I used.

Cory testified he called the local police after Natascha left. When asked why he thought that was necessary, he testified, "Because there was a lot of—well, what I call harassing e-mails and incidences that I just didn't want to keep going on, and I wanted it to stop." On cross-examination, Cory admitted the cops did not come

to the scene when he called; in fact, "they didn't even move forward in an investigation until [he] had additional follow-up." Later, after Natascha was criminally charged, Cory called the Iowa Department of Human Services (DHS) and reported the same incident to it. During cross-examination, the following exchange with Cory took place:

> Q. Why did you wait until after the criminal case was filed to call [DHS], sir? A. Because I was asking what they had said and they said they hadn't investigated yet.
> Q. And did you think that perhaps the police officers or the sheriff's deputies were the ones that were supposed to turn that in? A. Yep, I had talked to the police department.
> Q. And you asked, in fact, that they follow up and turn the case over to [DHS]; right? A. Asked what the procedure was, yes.
> Q. Why is it that you wanted that investigated? A. I wanted to verify [A.P.] was in a safe environment.
> Q. So 10 days after you and Natascha had a disagreement at an exchange, you were concerned enough for her safety that you thought she should be investigated by [DHS], am I understanding you correctly? A. Yes.
> Q. And that was after you allowed Natascha to leave with her in her vehicle that night; correct? A. Yes.

Despite advice from her attorney in the criminal matter about the right against self-incrimination, Natascha testified about the incident at the custody trial.[3] She testified that she took a present out of her car and, when Cory told her, "I don't want that," she put the gift in his vehicle rather than handing it to him. Cory got in her face and told her she was not "allowed to touch his car" or "anything of his" and that "[she] can't do that." Natascha testified she then attempted to take A.P. from Cory while he continued "getting in [her] face." Then she "put [her] hand on

---

[3] Cory's appellate brief wrongly claims that Natascha invoked her right against self-incrimination when asked about the incident. But, after first testifying that she had been advised of her Fifth Amendment right not to talk about it, Natascha confirmed her decision "to be able to speak on that issue" and then testified about the incident at length. At no time did she refuse to answer a question or invoke her right.

his face" and grabbed A.P. away from him. According to Natascha, she "had just grabbed [A.P.], put [her] hand on [Cory's] face, and he slapped my hand away hitting [A.P.]. [A.P.] was asleep at the time. [A.P.] woke up, now she's crying." As Natascha put A.P. in her vehicle, Cory told her she "had no right to touch him" and she "can't do that" and is "not going to get away with it." Natascha drove away with A.P. without further incident. She did not know she had been charged with anything until about one month later, when she was arrested. The domestic-violence and child-endangerment charges were still pending at the time of the custody trial. DHS's investigation of the incident had resulted in a report finding that the incident was "unfounded."

Natascha testified she should be awarded physical care of A.P., claiming that Cory can be "petty," he plays games, and takes actions with the intention "to provoke"; she opined that if he was given physical care of A.P., "that would be something else that he could control and would probably end up being even more game[s], with [A.P.] as the pawn, as to visitations and things like that." In support of these statements, Natascha introduced into evidence the district court's 2016 ruling on a modification action brought by Cory's former wife in an attempt to gain physical care of their children; the ruling highlighted Cory's inability to regulate his emotions and the concerning actions he took as a result. For example, three years after Cory and his former wife separated, when the former wife arrived at Cory's home to pick up the children for her Mother's Day visit with her boyfriend sitting in the car, Cory tried to kiss his former wife and would not let her leave with the children until she came inside and had breakfast with him and the girls. Cory seemed to be displaying similar behaviors with Natasha; Natascha testified—and

Cory admitted—that shortly after their relationship ended Cory had Natascha return to his home under false pretenses, telling her that he had fixed her son's car and it was ready to be picked up. When Natascha and A.P. arrived at Cory's home, he took and hid Natascha's car seat for A.P., refusing to allow Natascha to leave with the child unless she signed a handwritten note saying he would get to have A.P. half of the time, on the same schedule he had his other children. The interlude did not end until after Natascha called the local police.

In another instance, Cory entered Natascha's home without permission and took photographs; he introduced those photographs as evidence at the trial to show "that's where [A.P.] was living—in those conditions," which he described as a "messy, unkempt, disheveled house." But upon further questioning, Cory admitted that he was aware a tree had fallen on Natascha's home and, as a result, the home was under construction at the time he entered and took the photos. Natascha and A.P. stayed elsewhere while the construction work was being completed.

Additionally, when questioned, Cory admitted that on multiple occasions, he has alleged that Natascha has kidnapped A.P. One of the times Cory made the allegation was on a weekend Cory had scheduled parenting time but, due to one of his other daughters being in the hospital, asked Natascha to keep A.P. Then Cory sent Natascha a message telling her to bring A.P. to the hospital for a while; Natascha refused, telling him she was not at home and had other plans for the day. Cory responded to Natascha, telling her, "Bring her now. That is not an option and you don't get to decide. This is against the law. . . . You are withholding her. . . . This is not right of you morally or legally. You are kidnapping."

Finally, there was evidence that Cory, who is a white man, has made racist and belittling comments about and toward Natascha, who is an African-American woman. When asked if he "remember[ed] telling [Natascha] that she needed to call [him] master, in a way reference that she's African-American and [he's] a white man," Cory responded, "Yes." And Natascha testified as to comments Cory made about her to his other children, including that she "eat[s] dog," "can't read," "was raised with monkeys," and "grew up in a circus."

In response to Cory's concerns about Natascha being awarded physical care, Natascha agreed that she leaves A.P. with her mother while her stepfather is around. But she testified that both her mother and her stepfather acknowledge what the stepfather did, and the mother and stepfather have gone through therapy as a result. In addition, Natasha testified that her stepfather is never left alone with A.P.; "[t]hat has been a discussion and a full-on agreement between [the maternal grandmother] and [Natascha] that he's not to be left alone with [A.P.]" When the court asked Natascha what she would do if the court made it a condition that for her to be given physical care of A.P. she had to stop using marijuana to self-medicate and that she would be required to drug test to prove it, she testified,

> If that's something that I have to do to be awarded primary care, then so be it. It's not something that's—it's a vice that's keeping me gripped to it. It's something that helps, so I do it. If it's something that you tell me that, hey, this is the only way that you can have your daughter, then okay. It's not something that needs to be a debate.

The court issued its ruling in July 2021, granting Natascha and Cory joint legal custody of A.P. When considering which parent to award physical care, the court concluded that while the parties called their temporary arrangement shared cared, in reality, Natascha was A.P.'s primary caregiver for the nearly three years

between the temporary agreement and the custody trial. The court was concerned about Natascha's pending criminal charges, her admitted daily use of marijuana, and that A.P. continued to spend time in the presence of a man who molested Natascha when she was a child. However, the court believed Natascha's criminal charges "may be a case of overzealous policing"; that Natascha would cease using marijuana as she told the court; and that safety precautions had been put in place to protect A.P against possible abuse by the step-grandfather. On the other hand, the court concluded that Cory's "language is indicative of underlying racism. It is unacceptable and would be extremely damaging to A.P. if she overheard or was the subject of Cory's racially abusive language." The court awarded Natascha physical care of A.P, ruling:

> Natascha has maintained a good home for A.P., she has provided A.P.'s day-to-day supervision and physical care. She has provided a routine environment wherein A.P. is doing well. Natascha has provided successful caregiving in the past and the Court has no reason to believe this will not continue in the future.

Cory was given scheduled parenting time with A.P. and ordered to pay $811.97 per month in child support.

Cory appeals.

## II. Standard of Review.

"We review child custody and support orders de novo." *See McKee v. Dicus*, 785 N.W.2d 733, 736 (Iowa Ct. App. 2010). "[W]e recognize that the district court was able to listen to and observe the parties and witnesses. Consequently, we give weight to the factual findings of the district court, especially when considering the credibility of witnesses, but are not bound by them." *Id.* (internal

citation omitted).  "Our overriding consideration is the best interests of the child" at issue."  *Id.*

## III. Discussion.

### A. Physical Care.

Neither Natascha and Cory sought joint physical care—each requested physical care.  *See In re Marriage of Hansen*, 733 N.W.2d 683, 692 (Iowa 2007) (recognizing that when the court awards joint legal custody to the parents, the court is required to consider joint physical care "at the request of any party" (citing Iowa Code § 598.41(2)(b))); *see also* Iowa Code § 600B.40(2) (2018) (providing that section 598.41 applies to custody and visitation decisions involving never-married parents).  Without a request for joint physical care, "the court must choose one parent to be the primary caretaker, awarding the other parent visitation rights."  *In re Marriage of Hynick*, 727 N.W.2d 575, 580 (Iowa 2007).

When physical care is at issue, our primary consideration is the best interests of the child.  *See* Iowa R. App. P. 6.904(3)(o).  Our objective "is to place the child[] in the environment most likely to bring [the child] to health, both physically and mentally, and to social maturity."  *In re Marriage of Hansen*, 733 N.W.2d 683, 695 (Iowa 2007).

Cory challenges the district court's award of physical care to Natascha, largely disputing the amount of relative weight the court placed on various facts in reaching its decision.  He argues the court did not put place enough weight on Natascha's daily use of marijuana; her ongoing relationship with her mother, which puts A.P. in the presence of a man who molested Natascha when she was young; her "physical attack" of him during the exchange of A.P. and the resulting pending

criminal charges; and the fact that giving Natascha physical care will separate A.P. from her half-siblings. On the other hand, he argues the district court put too much weight on the fact that Natascha has been A.P.'s primary caregiver since the entry of the temporary agreement. And he maintains that the trial record does not support a conclusion that he is racist.

While we are concerned about Natascha's use of marijuana and the presence of her stepfather in A.P.'s life, the district court found credible Natascha's testimony that she would stop using marijuana and already had in place an agreed-upon plan with her mother that kept A.P. from being alone with the step-grandfather. *See In re Marriage of Vrban*, 359 N.W.2d 420, 423 (Iowa 1984) ("There is good reason for us to pay very close attention to the trial court's assessment of the credibility of witnesses. A trial court deciding a [custody] case 'is greatly helped in making a wise decision about the parties by listening to them and watching them in person.'" (citation omitted)). Plus, as Natascha points out, it seems Cory's concern about these issues is overstated; while he requested physical care of A.P., he testified he did not want to take over being A.P.'s primary caregiver until she reached school age—more than a year after the custody trial took place. So, presumably, he believed A.P. was safe in Natascha's care in the meantime. Finally, Cory fails to tie any problems experienced by A.P. with these concerns over the many months Natascha provided primary care.

We cannot and do not condone putting one's hands on another person. But both Cory and Natascha testified that the incident that led to Natascha being criminally charged was the only "physical incident" between the two; Natascha testified she now always takes a friend with her to exchanges, which has helped

make handoffs go easier, and that she intends to continue this practice going forward.

Cory's argument that the district court got the physical-care decision wrong focuses on Natascha's "bad acts" and completely ignores that he broke into Natascha's home to secretly take misleading photographs to use against her at the custody trial. We do not ignore that and, to be clear, we also do not condone his actions.[4] Similarly, Cory points out the district court wrongly found that Natascha testified Cory called her a specific racial slur—which we will not repeat—and that her testimony went uncontradicted on that point. As to that specific slur, Natascha was never asked about it, and Cory denied every saying it. With the aid of the transcript of the proceedings, we are able to confirm the district court misstated that finding of fact. But that does not change the fact that Cory admitted to telling Natascha she, as an African-American woman, needed to call him "master." And Natascha's testimony that Cory told his children Natascha was "raised by monkeys," among other pointed insults, did go uncontradicted.

Next, we consider Cory's argument that the court should have placed more weight on the fact that giving Natascha physical care of A.P. separates A.P. from her half-siblings. *See In re Marriage of Quirk-Edwards*, 509 N.W.2d 476, 480 (Iowa 1993) ("Siblings in dissolution actions should be separated only for compelling

---

[4] At trial, Natascha testified that Cory used his key to enter her home when she was not present and that she only learned he had taken the photographs when she saw them as part of his trial exhibits. Cory admitted that he let himself into her home when he was not invited but claimed she was home at the time; he maintained Natascha and A.P. were inside and he wanted to enter to console Natascha. The district court seemed to find Natascha to be the more credible witness.

reasons. The principle has also been recognized as having application to half siblings." (internal citations omitted)). A.P. shares a bond with her half-siblings, but she has never lived with them full-time; Cory has his other children only 50% of the time and, since she was approximately eight months old, A.P. spends only eleven of every twenty-eight overnights with Cory. *Cf. In re Marriage of Will*, 489 N.W.2d 394, 397–98 (Iowa 1992) (determining whether split physical care, i.e. "the separation of the children of the marriage between the parents," was appropriate by considering, in part, "whether the children would have been together if split physical care was not ordered"). In other words, even if Cory was given physical care of A.P. she would live with her half-siblings, at most, half of the time. When we balance this against Natascha's history as A.P.'s primary caregiver and the fact that A.P. has done well with that arrangement,[5] we agree with the district court that placing A.P. is Natascha's physical care is in A.P.'s best interests.

**B. Scheduled Parenting Time.**

Cory asks that we award him additional parenting time with A.P. The district court granted him the following:

> 1. Prior to enrollment in kindergarten[6]:
> (a) Week One: Petitioner shall have visitation with the child from Thursday at 5:00 p.m. until Sunday at 7:00 p.m.

---

[5] In reviewing the record, there is actually little to no information about how A.P. is as a person and how she is faring. But in this case, and with the way each party testified at length about the other parent's faults and bad acts, we assume no news is good news. The most information about A.P. actually came from Cory's ex-wife, who testified that when she sees A.P., A.P. is "always happy, content, clean, well-dressed"; A.P. "talks really well" and "talks a lot about the things that they're doing." According to the ex-wife, A.P. is "[a]lways super happy, smiling, [and] engaging to everyone that's around us."

[6] Based on Natascha's and Cory's testimony, it seems likely that A.P. will be enrolled in kindergarten in the fall of 2023.

(b) Week two: Petitioner shall have visitation with the child every from Wednesday at 5:00 p.m. until Thursday at 5:00 p.m.

2. Post-enrollment in kindergarten: Petitioner shall have visitation with the child every other weekend from Friday at 5:00 p.m. until Sunday at 8:00 p.m.

Additionally, on top of the regular schedule, Cory was given two uninterrupted two-week periods during the summer.

On appeal, Cory asks our court to change his scheduled parenting time to the following:

1. Prior to enrollment in kindergarten:
(a) Week One: Cory shall have visitation with the child from Wednesdays at 5:00 p.m. until Friday at 5:00 p.m.;
(b) Week Two: Cory shall have visitation with the minor child Wednesday at 5:00 p.m. to Sunday at 7:30 p.m.;
(c) The parties should keep the same schedule during the summer. Both parties are entitled to a two-week vacation period with A.P. during the summer months of June through August.
2. Once A.P. begins kindergarten and thereafter:
(a) Alternating weekends from Friday after school to the following Sunday at 7:30 p.m.;
(b) If A.P. does not have school on Mondays or Fridays that are adjacent to Cory's parenting weekend and not part of a holiday break or not caused by inclement weather, then:
(1) On a Friday with no school, Cory's time with A.P. begins Thursday at 5:00 p.m.;
(2) On a Monday with no school, Cory's time with A.P. ends when classes begin on Monday.
(c) For all no-school-Fridays that do not fall on his parenting weekend, Cory will have A.P. Thursday nights at 5:00 p.m. into Friday at 5:00 p.m.;
(d) All weekends when Natascha has to work;
(e) This schedule continues due summer break, but both parties are entitled to one two-week vacation period with A.P. each month during June, July and August.

We recognize that, "[u]pon awarding one parent physical care, the district court shall award the other parent visitation that assures the children 'the opportunity for the maximum continuing physical and emotional contact with both parents.'" *In re Marriage of Gensley*, 777 N.W.2d 705, 717 (Iowa Ct. App. 2009)

(quoting Iowa Code § 598.41(1)(a)). But, as Natascha points out, Cory did not ask the district court for this visitation schedule until after the court gave Natascha physical care.[7] In his testimony,[8] Cory asked for the parents to maintain the schedule as set by the temporary agreement until A.P. started preschool, at which point he would take over physical care and he and Natascha would "rotate weekends." He testified he did not include any weeknight visitation time for Natascha "due to distance" between their homes.

Because of the nearly one-hour travel time between the homes, Cory testified he believed that the appropriate amount of visitation for the non-physical care parent was alternating weekends without mid-week visits. Yet now he complains when the district court set that schedule. That being said, we change the parenting schedule as it pertains to after A.P. enrolls in kindergarten to add parenting time on a Friday or Monday that is adjacent to Cory's weekend when A.P. does not have school. We make this change because—albeit at different times during the proceedings—both Natascha and Cory have agreed to the additional time.[9] We modify the district court's visitation schedule to add the italicized language:

---

[7] Cory filed a post-trial motion asking the court to reconsider its ruling; it was in this filing that Cory first proposed the parenting schedule he now seeks.

[8] The uniform trial schedule order filed in this case required "a written statement from each party as to the specific requested relief on contested matters, [which] shall be submitted at trial." Cory referenced his proposed relief in his trial testimony, but the record before us is devoid of any written filing.

[9] On appeal, Natascha asks us to affirm the district court's order as written. But in her "request for relief" that she filed in the district court, she agreed that Cory should have the additional overnight when it was adjacent to his parenting weekend.

2. Post-enrollment in kindergarten: [Cory] shall have visitation with the child every other weekend from Friday at 5:00 p.m. until Sunday at 8:00 p.m.

*But if A.P. does not have school on a Friday or a Monday that is connected to Cory's regular, alternating weekend parenting schedule and not part of a holiday break or not caused by inclement weather, his parenting time shall be expanded as follows:*

*a. If there is no school on a Friday, his parenting time shall begin on Thursday at 5:00 p.m. and continue until Sunday at 8:00 p.m.*

*b. If there is no school on a Monday, his parenting time shall begin on Friday at 5:00 p.m. and continue until at 8:00 p.m. on Monday.*

We otherwise affirm the district court's visitation schedule.

**C. Appellate Attorney Fees.**

Finally, Natascha asks us to award her appellate attorney fees. "An award of appellate attorney fees is within the discretion of the appellate court." *Markey v. Carney*, 705 N.W.2d 13, 26 (Iowa 2005). "Whether such an award is warranted is determined by considering 'the needs of the party making the request, the ability of the other party to pay, and whether the party making the request was obligated to defend the trial court's decision on appeal.'" *Id.* (citation omitted). While Natascha was obligated to defend the district court's decision on appeal; we also modified the visitation in favor of Cory, so we conclude that each party shall be responsible for their own appellate attorney fees.

**AFFIRMED AS MODIFIED.**